**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

FILED

AUG 2 7 2014

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**DALE JOSEPH NORMAN,**

**Plaintiff,**

**v.**                    **Civil Action No. 2:14CV33**
                    **(The Honorable John Preston Bailey)**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Dale Joseph Norman ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. Procedural History

Plaintiff filed applications for SSI and DIB on March 31, 2011, alleging disability since October 6, 2008, due to "epilepsy, problems with feet due to burns" and "right knee and right hip problems" (R. 204-17, 288). The state agency denied Plaintiff's applications initially and on reconsideration (R. 97-100, 121-44). Plaintiff requested a hearing, which Administrative Law Judge John Michaelsen ("ALJ") held on December 7, 2012, in Morgantown, West Virginia, and at which Plaintiff, represented by counsel, Justin White, and Larry Ostrowski, a vocational expert ("VE")

testified (R. 42-71).  At the hearing, Plaintiff amended his alleged onset date to March 31, 2011 (R. 46).  On January 13, 2013, the ALJ entered a decision finding Plaintiff was not disabled (R. 10-20).  On March 6, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-4).

## II. Statement of Facts[1]

Plaintiff was born on August 30, 1958, making him fifty-four (54) years old at the time of the administrative hearing.  Plaintiff earned his GED (R. 288).  His past work was that of a laborer in the construction industry (R. 289).

Plaintiff presented to the emergency department at Stonewall Jackson Memorial Hospital on July 23, 2010 with complaints of pain after a fall (R. 895).  He was experiencing pain in his chest (R. 903).  While there, he underwent a CT scan of his chest.  Dr. James Ross noted that there was no "evidence for injury involving the chest."  Plaintiff did have a "small nodular density in the right middle lobe" which was likely benign.  However, Dr. Ross recommended that Plaintiff follow up in six (6) months (R. 909).  Plaintiff was discharged home with a prescription for Percocet and was instructed to follow up with his doctor (R. 897-98).

On July 27, 2010, Plaintiff saw Dr. Robert Dale, a podiatrist, for routine nail care and pain in his left foot after his fall.  Plaintiff stated that the pain was located in his first and second toes.  His toenails hurt with weightbearing, shoes, and pressure.  Upon examination, Dr. Dale noted that

---

[1] The administrative record reflects that Plaintiff was previously denied DIB on initial determination on January 5, 2010 (R. 96, 111-15).  It appears that Plaintiff never requested reconsideration of that claim.  "An initial determination is binding unless you request a reconsideration within the stated time period, or we revise the initial determination."  20 C.F.R. § 404.905.  Plaintiff did not request reconsideration of the Administration's January 5, 2010 denial, making that determination is binding upon this Court.  Accordingly, the undersigned has only included that medical evidence which is dated subsequent to January 5, 2010.

Plaintiff's nails caused "marked limitation of ambulation" and placed Plaintiff at risk of infection because of their thickness. Plaintiff had "pain to palpation of nail 1-4 of bilateral feet and to toe 1 at the base of the distal phalanx and the distal 1/3 of the distal phalanx toe 1 left and to the medial aspect of the middle 1/3 of the middle phalanx 2nd toe left." Dr. Dale also noted some moderate edema and that Plaintiff's range of motion in those toes was "moderately decreased with pain at end point." He assessed "[f]racture toe 1 & 2 left foot" and onychomycosis. Dr. Dale debrided Plaintiff's toenails and instructed him to rest as much as possible, do minimal walking, and ice and elevate his foot (R. 486).

Plaintiff followed up with Dr. Dale two days later, on July 29, 2010. He complained of right foot pain. The pain caused him to be unable to bear weight, and he rated the pain as a 10/10. Upon examination, Dr. Dale noted a "severe amount of edema of the dorsal right foot" and "pain to palpation of a severe amount at the base of the 2nd metatarsal of dorsal right foot." Plaintiff also had a decreased range of motion in his right ankle. Dr. Dale obtained X-rays, which showed a new fracture at Plaintiff's 2nd metatarsal on his right foot. Dr. Dale prescribed Plaintiff a walker to use at all times with his right foot. Plaintiff was also advised to continue using the surgical shoe and to cut back on smoking because it could slow healing of the fracture (R. 487).

On August 3, 2010, Plaintiff saw Dr. David Watson at the Minnie Hamilton Health System. He complained of pain after falling and breaking two (2) toes on his left foot and one (1) on his right (R. 516). Dr. Watson assessed acute pain due to trauma and prescribed Percocet (R. 517).

Plaintiff saw Dr. Dale again on August 31, 2010. He complained of still having moderate to severe pain, with his right foot worse than his left. Plaintiff was still using a surgical shoe on his left foot and using the walker all the time with his right foot. Upon examination, Plaintiff had "pain

to palpation of the dorsal right foot at the 2nd metatarsal base, at the 1st toe at the base of the distal phalanx, and at the head of the proximal phalanx 2nd toe left with worse pain at 2nd toe left." Plaintiff also had "mild edema right midfoot and 1st toe left and a moderate amount of edema, 2nd toe left." Range of motion of Plaintiff's right ankle caused mild pain at the second metatarsal base. Dr. Dale obtained X-rays, which showed that the fracture at the lateral cortex of his right second metatarsal base was "much better than last visit." The X-rays also showed that the fracture in Plaintiff's left first toe was "improved." However, the fracture in his left second toe had worsened. Dr. Dale told Plaintiff that it was "possible there was an injury to the blood vessel of 2nd toe and that is making the bone shorten and collapse like it is." He told Plaintiff to continue using the walker and surgical shoe. He prescribed Nucynta (R. 488-89).

On September 14, 2010, Plaintiff followed up with Dr. Dale for his fractures. Plaintiff stated that the pain was about "a 7/10 to both foot fractures", but they were "less often painful and only when he is on his feet a lot." Upon examination, Plaintiff had "mild pain to palpation at the 2nd met base area of dorsal right foot, and a moderate pain at the base of distal phalanx 1st toe left and the head of the proximal phalanx, 2nd toe left." He had no edema on his right foot, but had moderate edema "to left 2nd toe and no edema to left 1st toe." Dr. Dale assessed "[f]racture 2nd met right, left 1st and 2nd toes. He instructed Plaintiff to continue using the walker and surgical shoe if he expected to walk a lot. Plaintiff was to limit his walking (R. 489).

On October 15, 2010, Plaintiff followed up with Dr. Dale. He stated that there was "no pain at the fracture sites at all anymore except a very mild one at 1st toe left." Plaintiff complained that his feet burned and tingled at night and that his toenails were painful with weightbearing, shoes, and pressure. Upon examination, Dr. Dale noted that Plaintiff was infection prone and had "marked

limitation of ambulation" because of the severity and thickness of his toenails. Plaintiff had "pain to palpation of nail 1-4 of bilateral feet" and "only very mild pain at 1st toe left at the base of the distal phalanx medially." X-rays were obtained, which showed that Plaintiff's fractures were "much improved." Dr. Dale debrided Plaintiff's nails and noted that he could walk normally "in a tennis shoe with no limitations." He prescribed Neurontin (R. 490).

Plaintiff saw Dr. Watson again on December 7, 2010 with complaints that his feet were swelling. He also had a cough (R. 510). Upon examination, Dr. Watson found that Plaintiff's auscultation was "bilateral diffuse decreased breath sounds." He assessed osteoarthritis, localized, primary; and obstructive chronic bronchitis (R. 511). He prescribed Spiriva, Tessalon Perde, hydrocodone-acetaminophen, phenobarbital, and Dilantin (R. 512).

On January 10, 2011, Plaintiff saw Dr. Watson with complaints of pain in his feet. Several months previously, Plaintiff had fractured several toes on his left foot. He requested more narcotic pain medications. Plaintiff's fractures had healed. Dr. Watson noted that Plaintiff had a "long history with his feet, including club foot repair in the remote past and skin grafting S/P burn 2 years ago" (R. 507). Upon examination, Dr. Watson noted that Plaintiff's feet looked good and that Plaintiff was walking well without an antalgic gait. Dr. Watson assessed unspecified drug abuse, as Plaintiff refused to "step down to NSAID therapy" and walked out angrily when Dr. Watson refused "continued narcotic therapy now that the fractures have healed" (R. 509).

Plaintiff completed a Function Report–Adult on April 25, 2011. He indicated that he could not wear leather or steel-toed boots and that he had limited balance when standing and walking. Plaintiff could not squat, bend, or reach. He had trouble sleeping from nerve damage in his feet (R. 299). On a typical day, Plaintiff did laundry, talked with his family on the phone, watched television,

and sometimes read. He took short walks in his yard and at times did light exercises with a "stretch band." Plaintiff's conditions affected his ability to bathe (R. 300). He prepared meals daily and often prepared sandwiches and microwaveable meals. Plaintiff did laundry and some cleaning around the house; these tasks took him one (1) to one and a half (1.5) hours (R. 301). When going out, Plaintiff could walk and ride in a car; he did not drive. Plaintiff shopped for food by calling his sister when he needed food from the store. He could pay bills, count change, handle a savings account, and use a checkbook and money orders (R. 302). Plaintiff's hobbies included reading and watching television (R. 303). Plaintiff could walk half a mile before needing to stop and rest for ten (10) to fifteen (15) minutes (R. 304).

Plaintiff had a consultative examination with Dr. Bennett Orvik on June 28, 2011. Plaintiff reported that he suffered from significant problems with foot pain as well as grand mal seizures. He stated that his seizures were "fairly well controlled" and that he only experienced two or three per year (R. 629). Plaintiff also had problems with pain in his right knee and hip. His foot pain prevented him from working. Plaintiff experienced "aching and burning pain" "most of the time." His pain was aggravated by physical activity; Tylenol and a heating pad "somewhat" helped to alleviate pain (R. 630). Plaintiff had a history of alcoholism but reported that he now drank "occasionally" (R. 631).

Upon examination, Dr. Orvik noted that Plaintiff's "[a]uscultation reveal[ed] few basilar rhonchi" (R. 631). His pulses were "normal in radial, brachial, and pedal areas bilaterally." Plaintiff had 5/5 muscle strength in his arms and legs. Deep tendon reflexes were "[f]aint to 1+ in the knees and ankles bilaterally." Plaintiff had a normal straight leg raise test in both the supine and sitting positions. His cervical spine "showed mild decrease in extension at 60 degrees." Dr. Orvik noted that Plaintiff had some tenderness in his right knee. Plaintiff tandem walked "poorly" and had a

right-sided limp. He could not walk on his heels and walked some on his toes. Dr. Orvik performed a pulmonary function test and concluded that Plaintiff had normal spirometry. He diagnosed seizure disorder; foot pain with history of foot burns; osteoarthritis; and probable alcoholism in remission (R. 632). Dr. Orvik noted, based on Plaintiff's statements, that Plaintiff could sit for about one (1) hour at a time; could stand for about fifty (50) minutes at a time; could walk for one (1) mile before experiencing foot pain; and could lift and carry forty (40) pounds (R. 633).

On July 13, 2011, Dr. R. Weisberg completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Weisberg found that Plaintiff could occasionally lift and carry twenty (20) pounds; could frequently lift and carry fifty (50) pounds or more; could stand, walk and sit for about six (6) hours during an eight (8)-hour workday; and was unlimited with pushing and pulling (R. 641). Plaintiff could occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds. He could frequently balance, stoop, kneel, crouch, and crawl (R. 642). Dr. Weisberg noted that Plaintiff needed to avoid all exposure to hazards (R. 644). He found that Plaintiff needed a "mild RFC due to seizure state" and that Plaintiff's allegations were not "totally consistent" with the medical evidence (R. 647).

Plaintiff saw Dr. Robert Dale on July 22, 2011, with complaints of "painful right top of foot which feels like it tightens up which has been present for months." He rated the pain as a 10/10 and described it as "sharp and stabbing." Plaintiff had tried over the counter medications to alleviate the pain. He also complained that his toenails were painful with weightbearing, shoes, and pressure. Upon examination, Dr. Dale noted that Plaintiff had "pain to palpitation of nail 1-5 left and nail 1-5 right." Plaintiff was "infection prone in the absence of treatment due to the severity, thickness and elongation of the toenails." He also had "marked limitation of ambulation due to thickness and

deformity of nails." Dr. Dale assessed onychomycosis and restless leg syndrome. He performed electromechanical debridement of Plaintiff's toenails and referred him to Dr. Alghadban for restless leg syndrome (R. 657).

On August 3, 2011, Dr. Weisberg amended his previous findings in the Physical Residual Functional Capacity Assessment. He stated that Plaintiff could occasionally lift and carry fifty (50) pounds and could frequently lift and carry twenty-five (25) pounds (R. 658).

Plaintiff saw Dr. Adnan Alghadban on August 12, 2011 with complaints of numbness and tingling in his lower extremities. Plaintiff reported that he had been experiencing pain, numbness, and burning in both feet. The pain was worse at night, especially when he went to bed. Upon examination, Dr. Alghadban noted that Plaintiff had "decreased pinprick and touch in a stocking distribution." His reflexes were absent in the ankles. Dr. Alghadban assessed numbness and burning in his lower extremities. An "EMG nerve conduction study was suggestive of neuropathy most likely causing his symptoms." He prescribed Lyrica and noted that Plaintiff would undergo an EEG for seizures (R. 661).

On September 6, 2011, Dr. Weisberg confirmed his July 13, 2011 Physical Residual Functional Capacity Assessment and the August 3, 2011 addendum thereto (R. 659).

On September 15, 2011, Dr. Alghadban conducted an EEG on Plaintiff to rule out "epileptiform activity." He noted that there was "frequent spike in slow wave activity throughout" (R. 681). The background frequency was symmetrical bilaterally. EKG monitoring "showed no significant arrhythmia." Dr. Alghadban's impression was for an "abnormal sleep EEG consistent with epileptiform activity" (R. 682). That same day, Plaintiff underwent an EMG conducted by Dr. Alghadban (R. 663). Plaintiff's bilateral ulnar motor and sensory responses were normal. His

bilateral median mixed palm wrist responses "showed prolonged latency, normal amplitude, bilateral median motor responses were normal." Dr. Alghadban concluded: "This is an abnormal study. There is electrophysiological evidence of bilateral median focal mono neuropathy at the wrist level consistent with bilateral carpal tunnel syndrome mild in severity" (R. 664).

Plaintiff saw Dr. Dale with complaints of painful toenails on September 23, 2011. He complained of having heel pain, leg and foot cramps, and pain in his toenails with "weightbearing, shoes, and pressure." Plaintiff stated that he had been prescribed Lyrica by his neurologist and that the Lyrica helped "a little." His leg pain was worse when lying down. Upon examination, Dr. Dale noted that Plaintiff had "marked limitation of ambulation due to the thickness and deformity of the nails." Plaintiff was also "at risk and [was] infection prone in the absence of treatment due to the thickness and deformity of the nails." Dr. Dale found that Plaintiff had "1/4 pedal pulses bilaterally, absent digital/pedal hair growth, no teleangectasias and mild non-pitting lower leg edema, thin, atrophic pedal skin." He assessed "onychomycosis digital nails 1-5 right and 1-5 lifet–symptomatic, sciatica." Dr. Dale assessed Plaintiff's bilateral feet and performed electromechanical debridement of his nails. He instructed Plaintiff to attempt to maintain the length and thickness of his toenails "as best as possible by filing them between appointments with a normal fingernail file." Plaintiff was also to follow up with his neurologist about his back pain and leg cramps (R. 666).

Plaintiff saw Dr. Alghadban on September 28, 2011 "with a history of pain and numbness in his lower extremities." Dr. Alghadban noted a normal examination. He prescribed Tegretol (R. 680).

Dr. Porfirio Pascasio completed a Physical Residual Functional Capacity Assessment of Plaintiff on October 6, 2011. Dr. Pascasio found that Plaintiff could occasionally lift and carry fifty

(50) pounds; could frequently lift and carry twenty-five (25) pounds; could stand, walk, and sit for six (6) hours in an eight (8)-hour workday; and was unlimited with pushing and pulling (R. 669). Plaintiff could occasionally climb ramps and stairs, but could never climb ladders, ropes, and scaffolds. He could frequently balance, stoop, kneel, crouch, and crawl (R. 670). Dr. Pascasio noted that Plaintiff needed to avoid even moderate exposure to hazards (R. 672). He agreed with Dr. Weisberg's prior assessment that Plaintiff was partially credible (R. 673).

Plaintiff saw Dr. Alghadban for a follow-up appointment on October 10, 2011. He had "lots of insomnia and jerking movements." Dr. Alghadban noted that Plaintiff's examination was normal. He prescribed Xanax (R. 679).

On October 31, 2011, Plaintiff saw Dr. Alghadban for a follow-up appointment. Plaintiff's Tegretol seemed to be helping. Upon examination, Dr. Alghadban noted that Plaintiff had normal mental status, normal cranial serves, 5/5 motor strength, and normal coordination. However, Plaintiff's sensory examination showed "decreased pinprick and touch in a stocking distribution. Reflexes are absent in the ankles." Dr. Alghadban increased Plaintiff's Tegretol dosage (R. 678).

Plaintiff returned to Dr. Alghadban on November 23, 2011 for a follow-up appointment. Upon examination, Dr. Alghadban noted that Plaintiff had normal mental status, normal cranial nerves, 5/5 motor strength, intact senses, normal coordination, and symmetrical reflexes. He instructed Plaintiff to stop taking Tegretol and to continue Xanax, Dilantin, and Lyrica (R. 676, 677).

On December 2, 2011, Plaintiff saw Dr. Dale with complaints of painful toenails. Plaintiff had been unable to care for his nails because of their thickness and his inability to cut them. Plaintiff experienced toenail pain with weightbearing, shoes, and pressure. He reported that he was taking a new medicine for foot and leg cramps and that the treatment provided by Dr. Alghadban was

helping "a lot." Upon examination, Dr. Dale noted that Plaintiff had "pain to palpation of nail 1 through 5 right nail 1 through 5 left." His nails caused "marked limitation of ambulation due to the thickness and deformity." Plaintiff was at risk and "infection prone in the absence of treatment due to the thickness and deformity of the nails." Dr. Dale noted "1/4 pedal pulses bilaterally, absent digital/pedal hair growth, no telangectasias and mild non-pitting lower leg edema, thin, atrophic pedal skin." Plaintiff had decreased protective sensation. Dr. Dale performed electromechanical debridement of Plaintiff's toenails and instructed him to follow up with Dr. Alghadban (R. 691).

Plaintiff presented at Stonewall Jackson Memorial Hospital for imaging of his chest on December 19, 2011 because of his complaints of chest pain. Imaging showed "no infiltrate pulmonary edema pleural effusion or pneumothorax." Dr. Jon Laplante indicated that no signs of acute pulmonary disease existed (R. 894).

On January 16, 2012, Plaintiff saw Dr. Alghadban for a follow-up examination. Dr. Alghadban noted that Plaintiff had a history of seizures, headaches, neck and back pain, and anxiety. Plaintiff's examination was normal. Dr. Alghadban continued Plaintiff on Xanax, Mobic, and Dilantin and prescribed Prozac for depression (R. 689).

Dr. Abdulmalek Sabbagh conducted an echocardiogram on Plaintiff on January 17, 2012. Plaintiff's valves were within normal limits. Dr. Sabbagh concluded that Plaintiff had "[n]ormal left ventricular systolic size and function with ejection fraction 60%"; "[t]race mitral regurgitation"; and "[t]race tricuspid regurgitation" (R. 686, 819).

Plaintiff saw Dr. Sabbagh again on January 27, 2012 with complaints of chest pain. The pain was severe when Plaintiff extended his arms or coughed (R. 684, 816). Upon examination, Dr. Sabbagh did not note any abnormal findings. He assessed atypical chest pains. Plaintiff was to

undergo a sternal X-ray and was instructed to try to stop smoking (R. 685, 817).

On February 1, 2012, Plaintiff underwent a stress test at Stonewall Jackson Memorial Hospital. Dr. Sabbagh noted that Plaintiff had "very good distribution of the Cardiolite throughout the myocardium without significant area of fixed or reversible defect." Plaintiff had a negative test for ischemia and showed a normal ejection fraction of 64% (R. 688, 820, 878).

On February 10, 2012, Plaintiff saw Dr. Dale for routine nail care. He complained of having pain in his toenails with weightbearing, shoes, and pressure. Plaintiff also complained of his right hallux having severe, sharp shooting pains. He also complained of experiencing worsening numbness, tingling, and burning in his right foot. Plaintiff described his pain as a 10/10. Upon examination, Dr. Dale noted that Plaintiff had decreased protective sensation. He was also infection prone and had marked limitation of ambulation because of the thickness and deformity of his toenails. X-rays of Plaintiff's right foot showed "a fracture line base of distal phalanx medial cortex 0.2 cm long R hallux, fracture line base of proximal phalanx medial and lateral cortex across 1/4 of bone at each cortex." Plaintiff also had a "moderate sized bone spur dorsal R midfoot." Dr. Dale assessed onychomycosis; neuropathy; dorsal exostosis and neuritis midfoot R; stress fracture distal and proximal phalanx R 1st toe; and hallux valgus/limitus. He debrided Plaintiff's toenails. Plaintiff chose to receive a steroid injection for "the neuritis that is caused from the spur rubbing the nerve" (R. 692).

Plaintiff returned to Dr. Alghadban on February 13, 2012. His examination was normal. Prozac seemed to be helping Plaintiff. Dr. Alghadban instructed Plaintiff to continue taking Xanax, Mobic, Dilantin, and Phenobarbital (R. 690).

Plaintiff also saw Dr. Sabbagh again on February 13, 2012. He was still experiencing some

chest pains. Dr. Sabbagh's examination of Plaintiff was normal. He assessed atypical chest pains (R. 683, 815).

On February 15, 2012, Plaintiff saw Dr. Catherine Grant for a follow-up appointment. Plaintiff needed his Lyrica refilled (R. 736). Upon examination, Dr. Grant noted that Plaintiff was obese and had an antalgic gait. She diagnosed seizure/convulsions and osteoporosis, unspecified. She prescribed phenobarbital, Lyrica, Dilantin, and Xanax (R. 738).

Plaintiff returned to see Dr. Dale on February 28, 2012, for follow-up regarding his stress fracture. Plaintiff had bumped his right first toe on an appliance and was experiencing some severe swelling and pain. Icing and elevating the foot helped the pain and swelling. Upon examination, Dr. Dale noted that Plaintiff had "mild edema R hallux and R 1st met. head area w/o ulcer, w/o erythema, w/o drainage or any other infection signs." Plaintiff also had decreased protective sensation. Dr. Dale also took new X-rays. Those X-rays showed "a fracture line vertically at base of distal phalanx medial cortex 0.4 cm long R hallux worse this visit, fracture line base of proximal phalanx medial and lateral cortex across 2/3 of bone and worse." There was also a "fracture line going from medial cortex head 1st metatarsal 0.3 cm long which is new." Dr. Dale assessed stress fracture distal and proximal phalanx R 1st toe; traumatic fracture 1st met. head R; neuropathy; and hallux valgus/limitus R. He placed a splint on Plaintiff's first and second toes on the right foot and instructed Plaintiff to avoid trauma and to do minimal walking (R. 693).

On March 9, 2012, Plaintiff saw Dr. Dale for a follow-up regarding his stress fracture. He admitted that the fracture site swelled when he did not tape it. Plaintiff was doing minimal walking. He rated his pain as a 10/10 but admitted to "rarely" taking his pain medications. Upon examination, Dr. Dale noted that Plaintiff had "mild edema R hallux and R 1st met. head area." He assessed

"stress fracture distal and proximal phalanx R 1st toe, traumatic fracture 1st met. head R, neuropathy, hallux valgus/limitus R."  Dr. Dale instructed Plaintiff to use a walker at all times (R. 750, 755).

On March 12, 2012, Plaintiff returned to see Dr. Alghadban for a follow-up appointment. His examination was normal.  Dr. Alghadban continued Plaintiff on Xanax, Phenobarbital, and Dilantin.  He also increased Plaintiff's Prozac dosage (R. 749).

Plaintiff saw Dr. Grant again on April 23, 2012.  He complained of having pain in his sternum, knee, and hip.  Plaintiff also needed seizure medications (R. 731).  Dr. Grant instructed Plaintiff to continue taking clindamycin, phenobarbital, Lyrical, Dilantin, and Xanax (R. 733).  That same day, Dr. Grant completed a General Physical (Adults) for Plaintiff.  She noted that Plaintiff had a "slumped" posture and "peculiar to decreased flexibility of feet due to . . . burns and grafting." Plaintiff's gait was "unsteady" because of his injured nerve endings (R. 740, 822).  Dr. Grant stated that Plaintiff had decreased breath sounds, loss of sensation in both of his feet, depression, and was obese.  Plaintiff experienced stabbing pain in his right buttock and knee when walking.  His feet were often numb to above the ankles, and he experienced pain in his feet when sleeping.  Dr. Grant diagnosed neuropathy; epilepsy; osteoarthritis; osteoporosis; and COPD.  She opined that Plaintiff was not able to work full-time (R. 741, 823).  Overall, she stated that Plaintiff didn't "seem to be employable and has conditions that are chronic and require lifelong medical care" (R. 742, 824).

On May 4, 2012, Plaintiff saw Dr. Dale for a follow-up regarding his stress fracture.  He again rated his pain as a 10/10, but admitted to "rarely" taking his pain medications.  Upon examination, Dr. Dale noted that Plaintiff's nails caused him to be infection-prone and to experience "marked limitation of ambulation" because of their deformity.  Plaintiff's fractures appeared to be healed "except mildly at 1st toe prox. phalanx base."  Dr. Dale assessed "onychomycosis nail 1-5

b/l–symptomatic, midfoot dorsal exostosis and neuritis R, stress fracture distal and proximal phalanx R 1st toe–resolving, traumatic fracture 1st met. head R–resolved, neuropathy, hallux valgus/limitus R." He told Plaintiff the neuritis may be causing the toes on his right foot to hurt. He recommended that Plaintiff have X-rays taken at United Hospital Center; Plaintiff said he would wait. Dr. Dale recommended that he continue to rest and ice the feet. He injected Plaintiff's dorsal right foot with bupivicaine to help with pain (R. 751, 756).

Dr. Alghadban conducted an EEG of Plaintiff on May 29, 2012. Both the awake/drowsy and sleep EEGs were normal (R. 745, 747). Plaintiff's examination was normal. Plaintiff had complaints of some dizziness. Dr. Alghadban conducted autonomic function testing, which was negative. He continued Plaintiff on his medications (R. 746).

Also on May 29, 2012, Plaintiff returned to see Dr. Dale. He complained of pain in his medial right foot and arch left foot. He also had mild pain in his right ankle tendon when he used his ankle brace and was on his feet "a few hours." Plaintiff also complained of cramps and aches in his leg muscles and rated the pain as a 10/10. Air conditioning and cold air aggravated the pain in his feet. Plaintiff's neuritis pain had returned to the same "moderate/severe level now before injection." Upon examination, Dr. Dale noted that Plaintiff had no edema. His fractures were healed "except mildly at 1st toe prox. phalanx base." Dr. Dale assessed "midfoot dorsal exostosis and neuritis R, R PT tendon dysfunction, L plantar fibroma, stress fracture distal and proximal phalanx R 1st toe–resolving, neuropathy, hallux valgus/limitus R." He injected Plaintiff's dorsal right foot with bupivicaine and advised him to continue to ice and rest his feet (R. 752, 757).

Plaintiff returned to Dr. Alghadban on June 18, 2012. He had complaints of "numbness and tingling in both lower extremities along with back pain." Plaintiff's examination was normal. Dr.

Alghadban instructed Plaintiff to continue taking phenobarbital. He conducted an EMG and nerve conduction study, which was "unremarkable." Dr. Alghadban noted that Plaintiff's numbness and tingling "could be related to a lumbar etiology or borderline neuropathy." He increased Plaintiff's Lyrica dosage (R. 744).

On June 21, 2012, Plaintiff saw Dr. Dale for a follow up. He stated that after the injection from his last visit, "his feet started feeling a lot better." However, they had started hurting again, with the pain being a 10/10. Plaintiff reported that Dr. Alghadban had conducted nerve tests and that is nerve loss was worse in his legs. After examining Plaintiff's feet, Dr. Dale assessed "neuroma 3rd ws b/l–new, midfoot dorsal exostosis and neuritis R, R PT tendon dysfunction, L plantar fibroma, neuropathy, hallux valgus/limitus R." He injected both feet with a solution containing dex. acetate and sensorcaine (R. 754, 759).

Plaintiff saw Dr. Dale again on July 19, 2012. He had the same complaints that he raised at his previous visit. Plaintiff also complained of pain in his medial left midfoot and arch. Upon examination, Dr. Dale assessed "neuroma 3rd ws b/l, midfoot dorsal exostosis and neuritis R, R PT tendon dysfunction, neuropathy, hallux valgus/limitus R." He injected Plaintiff's feet to treat his exostosis and neuroma. Dr. Dale advised Plaintiff that he could not do another injection for exostosis in another six (6) months. He recommended that Plaintiff get new shoes, get inserts for his shoes, and continue to use a velcro brace for his tendon. He referred Plaintiff to WVU neurology for a second opinion (R. 760).

Plaintiff returned to see Dr. Dale on August 13, 2012. He stated that after the injections at the last visit his feet "started feeling a lot better", but he had "been having more pain in the past 2 weeks" across the top of his right foot. Plaintiff described the pain as being 10/10. He stated that

his feet were still sensitive to cold. Upon examination, Dr. Dale assessed "neuroma 3rd ws b/l, midfoot dorsal exostosis and neuritis R, R PT tendon dysfunction, neuropathy, hallux valgus/limitus R." He injected Plaintiff's feet to treat his neuromas and indicated that he could administer no more injections for another six (6) months. Dr. Dale advised Plaintiff to get new shoes and indicated that he could give him a discount on heat molded orthotics. Plaintiff desired to be fitted for those at his next visit (R. 761).

Plaintiff saw Dr. Grant on August 16, 2012 for a follow-up visit for a fractured sternum. Plaintiff was "not in extreme pain with deep breaths" (R. 778). Upon examination, Dr. Grant noted that Plaintiff was overweight and that he had "[a]nterior chest tenderness." She advised Plaintiff not to do any heavy lifting and should follow up if he experienced shortness of breath (R. 780).

On August 22, 2012, Plaintiff underwent an X-ray of his thoracic spine at Stonewall Jackson Memorial Hospital. Dr. W. Parke Thrush noted that there was "[n]o definite compression fracture." However, Plaintiff's thoracic spine did show "[m]oderate degenerative changes" (R. 877).

Plaintiff saw Dr. Dale again on August 31, 2012. He had the same complaints as his last visit. Plaintiff told Dr. Dale that Dr. Alghadban had increased his neuropathy medication but that it was "making him progressively more dizzy." Upon examination, Dr. Dale noted that Plaintiff had a "positive tinel's sign going from dorsal R midfoot 2nd metatarsal base R foot to toes 1 and 2 R foot." He assessed "neuroma 3rd ws b/l, midfoot dorsal exostosis and neuritis R, R PT tendon dysfunction, neuropathy, history of burn injury, hallux valgus/limitus R." Dr. Dale cast Plaintiff for heat molded orthotics and added a wedge to the bilateral plantar/lateral heels. Plaintiff stated that it felt "a lot better" and that about "80-90% of his foot pain was improved" (R. 762).

Plaintiff returned to see Dr. Dale on September 27, 2012. He complained of pain in his

neuroma; he rated the pain as being 10/10 and fairly constant. Plaintiff reported that the heat molded orthotics "really helped with the arch pain and PT tendon problem, but not for much else." Upon examination, Dr. Dale noted a "positive tinel's sign going from dorsal R midfoot 2nd metatarsal base R foot to toes 1 and 2 R foot." He assessed "neuroma 3rd ws b/l, midfoot dorsal exostosis and neuritis R, R PT tendon dysfunction, neuropathy, history of burn injury, hallux valgus/limitus R." Dr. Dale recommended that Plaintiff undergo "neuroma excision 3rd WS b/l and dorsal exostectomy R midfoot." Plaintiff indicated that conservative care, including over the counter and prescribed medications, rest, ice, steroid injections, shoe modifications, orthotics, and referral to two neurologists had "helped the pain mildly, but it still bothers [him] with walking, exercising, certain shoes." Plaintiff was "tired of the problem and asked about surgery." Dr. Dale described the surgical process to Plaintiff (R. 763-72).

On October 1, 2012, Plaintiff was transported to the emergency room at Stonewall Jackson Memorial Hospital for seizures (R. 866). Plaintiff reported that he had been having multiple seizures since 2:00 a.m. and that his symptoms came on "suddenly." Plaintiff's examination was normal (R. 868). Dr. Gregory Michael diagnosed chronic seizures, subtherapeutic tegretol level. Plaintiff was discharged home and instructed to follow up with Dr. Alghadban (R. 869).

On October 2, 2012, Plaintiff was transported to the emergency room at the Minnie Hamilton Health System for seizures (R. 790). He was oriented as to place but disoriented as to time, as he thought that the year was 1982 (R. 794). Plaintiff underwent a CT scan of his head, which demonstrated "no evidence of intracranial hemorrhage, shift of midline structures, extra axial fluid collection, mass or mass effect." Dr. James Ross noted that it was a normal CT scan (R. 809). Plaintiff was transported to United Hospital Center for further treatment (R. 794). At United

Hospital Center, Plaintiff reported that over the last week, his physician had started him on amitriptyline for peripheral neuropathy. He began having recurrent seizures after taking the first dose over the weekend (R. 851, 917). Dr. Abdallah Geara assessed status epilepticus likely secondary to medication interaction (R. 852, 918). Plaintiff was discharged on October 4, 2012 and was directed to follow up with Dr. Alghadban (R. 850, 916).

Plaintiff spoke to Dr. Dale by telephone on October 12, 2012. He stated that his foot pain was worse, especially at the top of his right foot and the arch of his left foot. Plaintiff reported that he was seeing Dr. Alghadban on October 15, 2012 for clearance for surgery. Dr. Dale stated that if Dr. Alghadban cleared him for surgery, he may be able to "move up his surgery" by approximately one (1) week (R. 774).

Plaintiff saw Dr. Grant on October 22, 2012 for a pre-operative physical. He reported that Dr. Dale planned to perform "excision of neuroma third interspace bilateral feet and dorsal exostectomy on the right foot (R. 775). Dr. Grant assessed epilepsy, COPD, and overweight (R. 776). That same day, Dr. John Leon conducted imaging of Plaintiff's chest at the Minnie Hamilton Health System. Imaging showed "[n]o acute cardiopulmonary process" (R. 810).

On October 29, 2012, Dr. Alghadban completed a Seizures Residual Functional Capacity Questionnaire for Plaintiff. He noted that he had treated Plaintiff for the past year. Plaintiff suffered from generalized seizures and experienced loss of consciousness. He had approximately three (3) seizures per month. A typical seizure lasted one (1) to two (2) days. Plaintiff did not always have warning of an impending seizure and could not always take safety precautions (R. 841). During and immediately after seizures, Plaintiff needed something soft placed under his head, needed his glasses removed, needed the area cleared of hard or sharp objects, and needed turned on his side. After

seizures, Plaintiff experienced confusion, exhaustion, irritability, severe headache, and muscle strain. These symptoms would last for three (3) days after a seizure. Dr. Alghadban noted that having a seizure "significantly" interfered with Plaintiff's daily activities and that he had a history of injury during a seizure. Plaintiff was compliant with taking his medication (R. 842). His medications caused him to be lethargic. Dr. Alghadban found that Plaintiff's seizures would likely disrupt co-workers and that he would need more supervision at work. Associated mental problems included depression and irritability (R. 843). Plaintiff would need to take unscheduled breaks during an eight (8)-hour workday. He was incapable of even "low stress" jobs (R. 844).

Plaintiff saw Dr. Dale at United Hospital Center on October 31, 2012. His chief complaint was "[p]ain to the 3rd web space bilateral feet and to dorsal midfoot right foot." Dr. Dale diagnosed him with "[t]hird web space neuroma bilateral feet and dorsal exostosis, right midfoot" (R. 939). Upon examination, Dr. Dale noted "moderate pain to palpation of the dorsal right mid foot at the second metatarsal cuneiform joint, moderate pain to palpation of the dorsal 3rd web space bilateral feet, right worse than left." Plaintiff had mild edema "to the plantar forefeet bilateral and the dorsal right mid foot." Dr. Dale noted a positive Tinel's sign "going from the dorsal right mid foot second metatarsal base right foot to toes 1 and 2, right foot" (R. 940). Plaintiff underwent an X-ray of his left foot, which showed "[m]inimal degenerative changes" but "[n]o acute abnormality" (R. 946).

That same day, Dr. Dale performed a bilateral third webspace neuroma excision, right foot dorsal exostectomy on Plaintiff (R. 942). During surgery, he found a "[h]ypertrophic nerve 3rd webspace bilateral, bone spurring and hypertrophic bone 2nd metatarsal–cuneiform joint R foot" (R. 943). Plaintiff was still experiencing pain during the procedure, and "27 cc lidocaine 2% plain was infiltrated around [his] surgery sites." Plaintiff was advised to do minimal walking with a surgical

shoe, cane, or four-leg walker. Dr. Dale instructed Plaintiff to follow up with him in five (5) days (R. 944).

On November 4, 2012, Plaintiff was transported to the emergency room at United Hospital Center after suffering from three seizures. During the first seizure, he had fallen and cut his nose (R. 930). Upon examination, hospital staff noted that Plaintiff had a minor laceration across the bridge of his nose with "slight skin avulsion, bleeding controlled, no septal hematoma." Plaintiff's phenobarbital levels were "a little low" (R. 932). His tetanus shot was updated; the laceration on his nose was repaired with steri-strips; and his phenobarbital dosage was increased. Plaintiff was discharged home and was instructed to follow up with Dr. Alghadban (R. 933).

Administrative Hearing

Plaintiff was 54 years old at the time of the hearing. His sister drove him to the hearing because Plaintiff last had a driver's license in 2008 (R. 50). Plaintiff stopped working in early 2008 because he sustained third-degree burns on his feet. For approximately ten (10) years prior to 2008, Plaintiff was employed laying track for a railroad company (R. 51).

Plaintiff testified that he cannot walk very well because of the burns to his feet. He had been experiencing two (2) to three (3) seizures per month. When he experienced a seizure, he would lose all his motor skills and "fall and . . . jerk a lot." Plaintiff saw a neurologist and took various medications for his medical problems (R. 52). He recently had a neuroma excision on his foot, which helped "with being able to sleep some of the night" because he did not experience as much cramping. Plaintiff also had some bone spurs removed. He stated that he was not really able to walk any better since the surgery (R. 53).

When asked by the ALJ, Plaintiff stated that his conditions affected his ability to stand and

walk.  He could stand for about fifteen (15) to twenty (20) minutes without assistance.  He could walk for about a mile but needed to stop numerous times along the way (R. 54-55).  Plaintiff had problems sitting because of swelling in his feet.  He could lift about fifteen (15) or twenty (20) pounds.  Plaintiff tried to do his own cleaning and laundry, but he could only stand for so long before needing to sit down in rest (R. 55).

Plaintiff lived with his mother and sister in his mother's trailer (R. 55-56).  He tried to help his mother by making coffee and doing some household chores.  Plaintiff also tried to walk around the yard every day (R. 56).  His sister took him to his appointments.  Plaintiff did not socialize with anyone else, but he would talk to a friend by telephone about once a week or every other week (R. 57).  He usually spent his time sitting in his bedroom.  Plaintiff could read if what he was reading was in "big print, bold print."  He did not have any problems with personal care (R. 58).

When asked by his attorney, Plaintiff stated that he did not know what caused his seizures.  He experienced seizures when he was working for the railroad, but he hid them from the foreman so that he could continue to work (R. 59).  Plaintiff missed work because of his seizures (R. 60).  His medications made him feel "groggy."  Plaintiff testified that sometimes he loses concentration and forgets what he was doing or what he was going to do (R. 61).  When asked by the ALJ, Plaintiff confirmed that he would tell his doctors that he had seizures while working, and that they would tell him to just make sure and take his medication (R. 62).

Plaintiff's attorney asked about his alcohol usage, noting that "prior to the onset date, there was a lot of reference to alcohol usage and whatnot."  Plaintiff replied that he did not drink often anymore.  He stated that he had problems with alcohol from about 2000 until the beginning of 2008 (R. 63).  Plaintiff had not had any problems with alcohol in the past two (2) years (R. 64).

The ALJ then asked the VE the following hypothetical question:

> If you would then, please assume an individual with the same age, education, and work experience as the claimant who is capable of light work further limited to no more than occasional climbing of ramps and stairs, and no climbing whatsoever of ladders, ropes, and scaffolds. The claimant must also avoid even moderate exposure to moving machinery, working at heights or any similar hazards. Would such an individual be capable of performing any of his past relevant work?

(R. 66-67). The VE responded that such an individual could not perform Plaintiff's past work, but could perform the jobs of marker, with 250,000 jobs nationally and 250 jobs regionally; mail clerk, with 70,800 jobs nationally and 60 jobs regionally; and packer inspector, with 468,000 jobs nationally and 300 jobs regionally (R. 67).

Evidence Submitted to Appeals Council

Plaintiff saw Dr. Alghadban for a follow-up visit on October 16, 2012. Upon examination, Dr. Alghadban noted that Plaintiff had normal mental status, normal cranial nerves, normal coordination, and 5/5 motor strength. Plaintiff's sensory examination showed "decreased pinprick and touch in a stocking distribution. Reflexes are absent at the ankles." Dr. Alghadban continued Plaintiff's Dilantin, Xanax, phenobarbital, and Lyrica (R. 948). That same day, he conducted an EEG, which was normal (R. 949).

On October 29, 2012, Plaintiff returned to see Dr. Alghadban. His examination "showed no change from previous visit." Dr. Alghadban prescribed phenobarbital, Dilantin, and Keppra (R. 950).

Plaintiff returned to Dr. Alghadban's office on November 5, 2012. His examination "showed no change from previous visit." Dr. Alghadban planned to refer him to Dr. Heiskell for a "VNS" (R. 951).

On January 21, 2013, Plaintiff had a follow-up visit with Dr. Alghadban. His examination

was normal. Dr. Alghadban instructed him to follow up with Dr. Heiskell for a "vagal nerve stimulator" (R. 952-53). Seven days later, Dr. Alghadban's findings remained the same (R. 954).

Plaintiff returned to Dr. Alghadban on February 11, 2013. Upon examination, Dr. Alghadban noted that Plaintiff had normal mental status, normal cranial nerves, 5/5 motor strength, symmetrical reflexes, intact senses, and normal coordination. He continued Plaintiff on Xanax and phenobarbital (R. 955).

On April 2, 2013, Plaintiff saw Dr. Alghadban for a follow-up. Upon examination, Plaintiff had normal mental status, normal cranial nerves, symmetrical reflexes, 5/5 motor strength, intact senses, and normal coordination. Dr. Alghadban continued him on phenobarbital, Xanax, and Dilantin (R. 956).

Plaintiff returned to see Dr. Alghadban on June 3, 2013. His examination findings were the same as they were at Plaintiff's previous visit. Dr. Alghadban prescribed phenobarbital, Dilantin, and Xanax (R. 957).

On July 1, 2013, Plaintiff saw Dr. Alghadban for a follow-up. His examination findings remained the same. Dr. Alghadban continued Plaintiff on Xanax and phenobarbital (R. 958). Later that month, on July 29, 2013, Dr. Alghadban's examination of Plaintiff returned the same findings. Dr. Alghadban continued Plaintiff on phenobarbital, Dilantin, and Xanax (R. 959).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Michaelsen made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since March 31,

2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: history of a seizure disorder; left foot fibroma; and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.      Since March 31, 2011, the claimant has had the residual functional capacity to perform a range of work activity that requires no more than a light level of physical exertion; requires no more than occasional climbing of stairs and ramps, and no climbing of ropes, ladders or scaffolds; and avoid even moderate exposure to moving machinery, working at heights and similar hazards (20 CFR 404.1567(b) and 416.967(b)).

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on August 30, 1958 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.      The claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. at 10-20.)

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

The Plaintiff contends:

1.    The ALJ committed reversible error in failing to properly evaluate his mental impairments and resulting functional limitations as required by 20 C.F.R. §§ 404.1520a and 416.920a; and

2.    The ALJ failed to comply with 20 C.F.R. §§ 404.1527 and 416.927 in evaluating the medical expert opinions available in the record.

(Plaintiff's Brief at 6-11.)

The Commissioner contends:

1.    Substantial evidence supports the ALJ's determination at Step Two that

Plaintiff's mental impairments were not severe; and

2.      Substantial evidences supports the ALJ's weighing of medical opinions.

(Defendant's Brief at 8-14.)

## C.  Evaluation of Mental Impairments

As his first claim for relief, Plaintiff asserts that the ALJ failed to properly evaluate his mental impairments and resulting functional limitations as required by 20 C.F.R. §§ 404.1520a and 416.920a. (Plaintiff's Brief at 6.) Specifically, Plaintiff argues that the ALJ "did not discuss any significant history, examination, or other evidence that was considered when forming his conclusion about the severity of Plaintiff's mental impairments or any resulting limitations." (Id. at 7.)

At Step Two of the sequential evaluation, Plaintiff bore the burden of producing proof that he had a severe impairment. Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983). However, a mere diagnosis of a condition is insufficient to prove disability; instead, there must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). "The severity standard is a slight one in this Circuit." Stemple v. Astrue, 475 F. Supp. 2d 527, 536 (D. Md. 2007). An impairment is not severe "only if it is a *slight abnormality* which has such a *minimal* effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal citation and quotation omitted) (emphasis in original); see also 20 C.F.R. § 404.1521(a) ("An impairment . . . is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

Furthermore, under the Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1);

416.945(a)(1). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, 1996 WL 374184, at *1. Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving her RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

20 C.F.R. §§ 404.1520a and 416.920a, which govern evaluation of mental impairments, state in relevant part:

(b) *Use of the technique.* (1) Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). . . . If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section.

(2) We must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record our findings as set out in paragraph (e) of this section.

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of

your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. . . .

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. . . .

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

(d) *Use of the technique to evaluate mental impairments.* After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).

(1) If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities . . . .

. . .

(e) *Documenting application of the technique.* . . . (4) At the administrative law judge hearing and Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the

severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

As to Plaintiff's alleged mental impairments, the ALJ stated at Step Two:

Furthermore, the undersigned finds that the claimant's history of substance abuse, history of anxiety, and borderline intellectual functioning do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere. In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria. The undersigned finds that these impairments are causing no more than mild limitation in activities of daily living, social functioning, and concentration, persistence, and pace, and have not caused and are not expected to cause any episodes of decompensation of an extended duration. This determination is supported by mental examinations in the record, which are normal (Exhibit D16F, D19F, D21F, D25F, D28F 6, and D36F 5). This is also supported by the opinions of the state agency medical consultants, which were given great weight even though they were for a period prior to the period under adjudication because the record shows no significant worsening of these impairments since they were given (Exhibits D3F and D6F).

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it is nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

(R. at 13.)

As an initial matter, the undersigned notes that record is devoid of any evidence that Plaintiff sought treatment for his alleged impairments from mental health professionals. Tellingly, while the record contains two consultative opinions pre-dating the relevant period, these were conducted in 2009, approximately two years prior to Plaintiff's amended alleged onset date of March 31, 2011. Accordingly, the undersigned finds that there is no evidence that Plaintiff suffered from a severe mental impairment during the relevant period.

According to Plaintiff, the ALJ "asserted that his finding was supported by six separate

mental examinations in the file [that] were 'normal,' although none of these 'mental examinations' were actually comprehensive psychological examinations." (Plaintiff's Brief at 7.) The undersigned has already noted that the record covering the relevant period does not contain any comprehensive psychological examinations because Plaintiff did not seek treatment from any mental health professionals. Nevertheless, Plaintiff's treating physician, Dr. Alghadban, noted on several occasions that Plaintiff had a normal mental status. (R. at 661, 676, 677, 678, 679, 680, 689, 690, 744, 746, 749.) The ALJ also correctly noted that when Plaintiff presented to the Minnie Hamilton Health System on August 16, 2012, for a follow-up regarding a fractured sternum, staff noted that he had a normal affect, was alert and oriented, and had a "[g]rossly normal intellect." (R. at 780.) Furthermore, when Plaintiff went to the emergency room at United Hospital Center after suffering seizures on November 4, 2012, staff there noted that Plaintiff had no previous psychiatric history (R. at 931), that he was oriented, and that he had normal judgment, affect, and psychiatric exam (R. at 932).

Plaintiff faults the ALJ for not discussing in detail the two opinions pre-dating the period under adjudication. On January 6, 2009, Dr. Kuzniar completed a Psychiatric Review Technique as to Plaintiff. He determined that Plaintiff suffered from an anxiety-related disorder, namely, adjustment disorder with anxiety. (R. at 367.) Dr. Kuzniar also determined that Plaintiff suffered from alcohol abuse. (R. at 370.) However, he noted that these impairments were not severe. (R. at 362.) Dr. Kuzniar found that Plaintiff had mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. at 372.)

Furthermore, on December 8, 2009, Dr. Klein completed a consultative evaluation of

Plaintiff. During the consultation, Plaintiff described his mood as "'anxious, irritable and depressed.'" He claimed to have problems concentrating and remembering things, and that he experienced panic attacks and nightmares. (R. at 469.) Plaintiff "acknowledged a life of alcohol dependence, especially whiskey." (R. at 470.) Upon examination, Dr. Klein noted that Plaintiff had a positive attitude, normal social interaction, and was oriented times two (2). He had a dysphoric mood and restricted affect. Plaintiff's comprehension was mildly deficient, his immediate memory was within normal limits, and his recent memory was moderately deficient. His concentration was moderately deficient, but his persistence was normal. (R. at 471.) Dr. Klein noted that Plaintiff was mildly deficient in social functioning. (Id.) He diagnosed alcohol dependence, alcohol induced mood disorder, and borderline intellectual functioning. (R. at 472.) Dr. Klein stated that Plaintiff's "anxiety and depression would appear to be significantly related to his Alcohol Dependence. An Alcohol Induced Mood Disorder would appear to explain the anxiety and depression." (Id.)

Contrary to Plaintiff's argument, the ALJ correctly noted that the record demonstrated no worsening of Plaintiff's alleged mental impairments since these opinions were given. As discussed above, various medical providers noted that Plaintiff had a normal mental status. Plaintiff's own statements support the ALJ's finding. On April 25, 2011, Plaintiff completed a Function Report–Adult. In that document, Plaintiff noted that it was hard for him to concentrate "at times." (R. at 303.) As to written and spoken instructions, he followed them "alright." (R. at 304.) The record also reflects that Plaintiff was no longer drinking heavily during the relevant period. (R. at 63-64, 631, 666, 728, 731, 931.)

Given this discussion, the undersigned finds that the ALJ did incorporate the special technique described in 20 C.F.R. §§ 404.1520a and 416.920a into his decision. The ALJ included

a "specific finding as to the degree of limitation in each of the functional area" described above. 20 C.F.R. §§ 404.1520a(e)(4); 416.920a(e)(4). The ALJ also referred to the medical evidence that he considered in reaching his conclusion that Plaintiff's alleged mental impairments were not severe.

Nevertheless, assuming *arguendo* that the ALJ erred, "[t]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate disability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); Hurtado v. Astrue, C/A No. 1:09-1073-MBS-SVH, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) ("[T]he court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision."). During the administrative hearing, Plaintiff's attorney asked the VE the following question:

> My question is to add–so I guess simple, simple repetitive tasks and also simple repetitive work, I know they're different, or one to two–I guess you did the SVP: 2, I'm sorry. That's all of those. Could you–would he still have the same jobs that you'd listed in hypothetical one?

(R. at 69.) The VE responded that Plaintiff could still perform the jobs of marker, mail clerk, and packer inspector because they were, by definition, "routine and repetitive." (R. at 67, 70.) The undersigned also notes that in his brief, Plaintiff has not identified any additional limitations that the ALJ should have included in his RFC and his hypotheticals to the VE. Given that, the undersigned finds that even if the ALJ erred, such error would not have changed his determination that Plaintiff was not disabled.

## D. Medical Opinions

As his second claim for relief, Plaintiff asserts that the ALJ failed to comply with the

requirements of 20 C.F.R. §§ 404.1527 and 416.927 when he evaluated the medical opinion evidence contained in the record. Specifically, Plaintiff argues that "the ALJ did not rely on any of the medical opinions available in the file and provided absolutely no explanation or justification for doing so." (Plaintiff's Brief at 11.) Plaintiff alleges that the ALJ's analysis "should have included the recognition of the examining relationship for each physician or psychologist providing opinion, with more weight given to those who personally examined and performed psychological testing of Plaintiff." (Id.)

20 C.F.R. §§ 404.1527(c) and 416.927(c) state:

*How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship*. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an

> acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig, however, the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
>> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d at 590. Furthermore, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983).

As to medical source opinions on issues reserved to the Commissioner, 20 C.F.R. § 404.1527(d) states:

> Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues

reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

> (1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

> (2) *Other opinions on issues reserved to the Commissioner.* We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity) . . ., or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

> (3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.

Social Security Ruling ("SSR") 96-5p provides the following examples of "administrative findings that are dispositive of a case":

> 1.      Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

> 2.      What an individual's RFC is;

> 3.      Whether an individual's RFC prevents him or her from doing past relevant work;

> 4.      How the vocational factors of age, education, and work experience apply; and

> 5.      Whether an individual is "disabled" under the Act.

SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). SSR 96-5p further provides:

> Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an

individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis. Adjudicators are generally required to request that acceptable medical sources provide these statements with their medical reports. Medical source statements are to be based on the medical sources' records and examination of the individual; i.e., their personal knowledge of the individual. Therefore, because there will frequently be medical and other evidence in the case record that will not be known to a particular medical source, a medical source statement may provide an incomplete picture of the individual's abilities.

Medical source statements submitted by treating sources provide medical opinions which are entitled to special significance and may be entitled to controlling weight on issues concerning the nature and severity of an individual's impairment(s). Adjudicators must remember, however, that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one.

. . .

Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

. . .

Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

Treating source opinions on issues reserved to the Commissioner will never be given controlling weight. However, the notice of the determination or decision must explain the consideration given to the treating source's opinion(s).

Id. at *4-6.

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977). The Administration has discussed the explanation of the weight to be given to a treating source's medical opinion, as follows:

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:
>
> When the determination or decision:
>
> *is not fully favorable, e.g., is a denial; or
>
> *is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;
>
> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). "[W]hen a physician offers specific restrictions or limitations . . . the ALJ must provide reasons for accepting or rejecting such opinions." Trimmer v. Astrue, No. 3:10CV639, 2011 WL 4589998, at *4 (E.D. Va. Sept. 27, 2011), aff'd by 2011 WL 4574365 (E.D. VA. Sept. 30, 2011). A logical nexus must exist between the weight accorded to

opinion evidence and the record, and the reasons for assigning such weight must be "sufficiently articulated to permit meaningful judicial review." DeLoatch, 715 F.2d at 150.

As to the opinion evidence, the ALJ stated:

> The claimant's ability to perform the work activity at the above residual functional capacity is generally supported by the opinions of the state agency medical consultants, which are accorded partial weight. The record supports most of these experts' findings, however, the undersigned finds that the claimant's combination of problems of the feet, obesity, and pain would preclude him from the medium exertional work they opined (Exhibits D12F, D14F, D15F, and D18F). The opinion of the consultative examiner was given no weight as he appears to have repeated the limitations stated by the claimant, but the consultative examination and the totality of the evidence do not support that degree of limitation (Exhibit D10F).
>
> Additionally, as to the other opinion evidence contained in the record, the undersigned gives little weight to these opinions. The evidence contains assessments by the Department of Health and Human Services but they are not supported by the totality of the evidence, as discussed above (Exhibits D24F 13-15, D28F 37-40, and D30F). Further, determinations as to whether an individual is disabled are an administrative finding that is reserved to the Commissioner (SSR 96-5p). In addition, the opinion of the claimant's treating physician, Dr. Alghadban is given little weight (Exhibit D31F). Dr. Alghadban opined that the claimant's seizures are disabling, but that is not supported by the overall record, including his treatment notes that indicate the claimant's seizures are generally controlled with medication. This opinion appears based on the exacerbation of seizures in October 2012, but as stated above, there is no indication in the record to support that these seizures will not again be adequately controlled with medication now that it has been adjusted. Also, no weight is given to the opinions of the state agency consultants prior to the alleged onset date as new evidence has been produced since that time (Exhibits D4F and D7F).

(R. at 17-18.)

Plaintiff asserts that the ALJ's "analysis should have included the recognition of the examining relationship for each physician or psychologist providing opinion, with more weight given to those who personally examined and performed psychological testing of Plaintiff." (Plaintiff's Brief at 11.) As discussed above, however, the only opinions in the record provided by psychologists predate the period under adjudication, and the undersigned has already found that the ALJ did not

err in determining that Plaintiff's alleged mental impairments were not severe and caused no resulting functional limitations.

The undersigned first finds that the ALJ properly assigned partial weight to the State agency physicians' opinions. 20 C.F.R. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I) provide:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence except for the ultimate determination about whether you are disabled.

The State agency physicians determined that Plaintiff could occasionally lift and carry fifty (50) pounds and could frequently lift and carry twenty-five (25) pounds. (R. at 658, 659, 669.) Accordingly, they found that Plaintiff could perform work at the medium exertional, which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). These opinions were supported by Plaintiff's statements that he could lift twenty-five (25) to thirty (30) pounds (R. at 304), and Dr. Orvik's note that Plaintiff could lift and carry forty (40) pounds (R. at 633). However, the ALJ only assigned partial weight to these opinions because Plaintiff's issues with his feet, obesity, and pain precluded him from performing medium work. (R. at 18.)

Given this, the undersigned finds that the ALJ's failure to discuss the evidence that was consistent with the State agency physicians' opinions is harmless error. See Morgan v. Barnhart, 142 F. App'x 716, 722-23 (4th Cir. 2005) ("Any error the ALJ may have made in rejecting Dr. Holford's medical opinion, which provided essentially the same time restriction on sitting and standing as the FCE, was therefore harmless."); Rivera v. Colvin, No. 5:11-CV-569-FL, 2013 WL 2433515, at *3

(E.D.N.C. June 4, 2013) ("[A]n ALJ's failure to expressly state the weight given to a medical opinion may be harmless error, when the opinion is not relevant to the disability determination or when it is consistent with the ALJ's RFC determination."); Bautista v. Astrue, Civil No. TJS-11-1651, 2013 WL 664999, at *6 (D. Md. Feb. 22, 2013) ("Assuming, for the sake of argument, that the ALJ erred by failing to assign weight to all of the opinion evidence in the record, the error could not have affected the outcome of the proceedings."). Therefore, the undersigned finds that remand for a determination of the express weight is unnecessary. Accordingly, the undersigned finds that remand for a full explanation is unnecessary. Cf. Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.").

The undersigned also finds that the ALJ properly assigned no weight to the opinion provided by consultative examiner Dr. Orvik. Dr. Orvik examined Plaintiff on June 28, 2011 and opined in relevant part:

> OPINION OF LIMITATIONS: Sitting–He says he can sit for about one hour at a time and has a problem of getting stiff. Standing–He says he can only stand for about 50 minutes because his feet hurt. Walking–He says he can walk maybe up to one mile then he would have foot pain. Lifting/carrying–He says he can lift and carry approximately 40 pounds, but he does not think he could carry it very far. Handling objects with his hands is not a problem. Traveling in a vehicle–He says he has trouble with traveling very far because his feet hurt. He is not driving because of a driving while intoxicated conviction in the year 2000. Hearing and speaking are unremarkable.

(R. at 633.) Dr. Orvik's written statement indicates that he based his "opinion" on Plaintiff's statements alone. Plaintiff's statements alone do not transform into objective evidence of his limitations. See Craig v. Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996); 20 C.F.R. §§ 404.1528(a),

416.928(a) ("Your statements alone are not enough to establish that there is a physical or mental impairment."). Dr. Orvik's opinion also is contradictory to the State agency consultants. Dr. Weisberg completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found that Plaintiff could occasionally lift and carry fifty (50) pounds; frequently lift and carry twenty-five (25) pounds. (R. at 658.) Plaintiff could stand, walk, and sit for about six (6) hours during an eight (8)-hour workday. (R. at 641.) Dr. Weisberg confirmed his findings on September 6, 2011. (R. at 659.) Dr. Pascasio found those same limitations on October 6, 2011, after completing a Physical Residual Functional Capacity Assessment of Plaintiff. (R. at 669.)

Likewise, the ALJ properly assigned little weight to Dr. Alghadban's opinion. Dr. Alghadban completed a Seizures Residual Functional Capacity Questionnaire on October 29, 2012. In that opinion, Dr. Alghadban opined that Plaintiff's seizures made him incapable of tolerating even "low stress" jobs. (R. at 844.) As an initial matter, the undersigned notes that the majority of this questionnaire was in a "check off" form, which has been referred to by other courts as "weak evidence at best." See, e.g., Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). Mason has been cited with approval by a number of district courts within the Fourth Circuit. See, e.g., Wright v. Astrue, 2013 WL 275993, at *5 (W.D. Va. Jan. 24, 2013); McGlothlen v. Astrue, 2012 WL 3647411, at *6 (Aug. 23, E.D.N.C. 2012); Bishop v. Astrue, 2012 WL 951775, at *3 n.5 (D.S.C. Mar. 20, 2012). The questionnaire is also internally inconsistent, as Dr. Alghadban noted that stress was not a precipitating factor for Plaintiff's seizures. (R. at 842.)

Furthermore, Dr. Alghadban's opinion is contradicted by his own treatment notes and other evidence of record. Dr. Alghadban's notes from August 2011 through September 2012 demonstrate

that Plaintiff had no complaints of recurrent seizures. (R. at 676-82, 689-90, 744-49.) Plaintiff did experience an increase in seizures in October and November 2012; however, those were caused by alterations to his medication. (R. at 851, 917, 932, 933.) Prior to that, his seizures had been "well controlled" on medication. (R. at 851.) Given this, the ALJ correctly assigned little weight to Dr. Alghadban's opinion, as the record show that Plaintiff's seizures were adequately controlled by medication. See Social Security Ruling ("SSR") 87-6, 1987 WL 109184, at *1 (Jan. 1, 1987) (noting that "most epileptic seizures are controllable and individuals who receive appropriate treatment are able to work").

Similarly, the ALJ correctly assigned little weight to the opinion provided by Dr. Grant on behalf of the Department of Health and Human Services. On April 23, 2012, Dr. Grant opined that Plaintiff "doesn't seem to be employable" based on his epilepsy, problems with his gait because of issues with his feet, and his poor dental health. (R. at 742, 824.) However, the undersigned finds that her opinion is contradicted by substantial evidence contained in the record. As discussed above, the evidence demonstrates that Plaintiff's seizures were adequately controlled by medication and did not preclude him from working. As to Plaintiff's dental health, there is no medical evidence in the record whatsoever regarding Plaintiff's teeth and whether they caused him to be unable to work. As to his issues with his feet, on August 31, 2012, Plaintiff told Dr. Dale, his podiatrist, that his feet felt "a lot better" and that about "80-90% of his foot pain was improved." (R. at 762.) Furthermore, the ALJ properly noted that Dr. Grant's statement that Plaintiff "doesn't seem to be employable" regards a finding that is reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p, 1996 WL 374183, at *2, *4-6.

Finally, the ALJ gave no weight to the State agency consulting physicians whose opinions

predated the alleged onset date of March 31, 2011. The undersigned finds that this was proper, as the record contains several pieces of evidence concerning Plaintiff's medical treatment and conditions since that time.

In sum, the undersigned finds that the ALJ correctly followed the special technique mandated by 20 C.F.R. §§ 404.1520a and 416.920a, and that substantial evidence supports the ALJ's finding that Plaintiff's alleged mental impairments were not severe. Furthermore, the undersigned finds that the ALJ did not err in his assignment of weight to the medical opinions contained in the record. Accordingly, the undersigned finds that substantial evidence supports the ALJ's finding that Plaintiff was not entitled to DIB and SSI.

## V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985);

Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _37_ day of _August_ , 2014.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE